United States District Court

For the Northern District of California

1

2

3

4                          UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7

8

CESAR E. SANCHEZ-RAMIREZ, et al.,

9
            Plaintiffs,                        No. C 12-3485 PJH
10
       v.                                      **ORDER GRANTING MOTION TO
11                                             DISMISS**
THE CONSULATE GENERAL OF
12  MEXICO IN SAN FRANCISCO,

13          Defendant.
    _____/
14

15      Defendant's motion to dismiss the above-entitled action for lack of subject matter

16  jurisdiction and for failure to state a claim, and plaintiffs' motion for leave to amend the

17  complaint, came on for hearing before this court on July 31, 2013.  Plaintiffs appeared by

18  their counsel Ashley Connell, and defendant appeared by its counsel Matthew Weiler.

19  Having read the parties' papers and carefully considered their arguments and the relevant

20  legal authority, the court hereby GRANTS defendant's motion to dismiss for lack of subject

21  matter jurisdiction, and DENIES the remaining motions as moot.

22                                  **BACKGROUND**

23      Plaintiffs Cesar Ernesto Sanchez-Ramirez ("Sanchez-Ramirez") and Consuelo

24  Violeta German ("German") were employed by defendant Consulate General of Mexico in

25  San Francisco ("the Consulate").  The Consulate is a representative of the Federal

26  Government of Mexico ("Mexico") in the United States, and provides a variety of essential

27  government services to Mexican nationals living in and around Northern California.  It is

28  staffed by members of Mexico's Foreign Service, who hold the top leadership positions, as

**United States District Court**
For the Northern District of California

1 well as numerous other officers and employees who provide governmental services to

2 Mexican nationals.

3 　　　Both Sanchez-Ramirez and German performed duties in performance of the

4 Consulate's exercise of its sovereign duties to its citizens located in the United States.

5 German was a Consulate passport officer, who assisted Mexican nationals in issuing or

6 renewing their Mexican passports.  Sanchez-Ramirez, who was trained as an attorney in

7 Mexico, performed services related to the Consulate's function as a <u>notario publico</u>.

8 　　　In Mexico, a <u>notario publico</u> is a state official, appointed by an individual state

9 governor, and the position carries greater responsibilities than that of an American "notary

10 public."

11 　　　　　[U]nder Mexican law . . . notarization makes contracts presumptively valid.
　　　　　<u>See</u> [1 Jorge A. Vargas, <u>Mexican Law: A Treatise for Legal Practitioners and</u>
12 　　　　　<u>International Investors</u> (1998) ("<u>Treatise</u>") §§ 1.22, 3.12].  Notaries in Mexico
　　　　　are "highly competent attorneys" who act as "authenticators of legal acts."
13 　　　　　[Citation omitted] "In Mexico, . . . the public notary (Notario Público) is the
　　　　　most respected member of the legal profession."  [Vargas, <u>Treatise</u> § 1.22.]
14 　　　　　Beyond just the presumption of validity, the process of notarizing the contract
　　　　　gave [defendant] an opportunity to seek further advice regarding the
15 　　　　　agreement and even to expose the alleged wrongful conduct to the notary
　　　　　who is a public official.  <u>See</u> <u>id.</u>
16
<u>Giner v. Estate of Higgins</u>, 2012 WL 123973 at *7 (W.D. Tex. Jan. 13, 2012).  Outside of
17
Mexico, a <u>notario publico</u>'s powers can be exercised only by the Federal Government of
18
Mexico, through its consular offices.  <u>See</u> <u>Mexican Law of Foreign Service</u>, Art. 44 (English
19
translation attached as Exhibit 2 to the Consulate's Request for Judicial Notice in Support
20
of Motion to Dismiss).
21
　　　Plaintiffs allege that in August 2011, Consul General Carlos Felix-Corona ("Corona")
22
sent a memo to all employees, requesting their participation in a march for Mexican
23
Independence Day (September 16), even though participating in the march was not part of
24
their regular job duties.  The request included a requirement that Sanchez-Ramirez practice
25
with a marching group every other day for several weeks.  FAC ¶ 43.
26
　　　Plaintiffs allege further that Sanchez-Ramirez has a "knee injury" that substantially
27
limits his major life activities.  He provided notice of this disability to his supervisor,
28

United States District Court
For the Northern District of California

1  Alejandro Mendoza ("Mendoza"), and requested that he not be compelled to participate in

2  the march.  However, when Mendoza informed Corona about the knee injury, Corona

3  allegedly stated that Sanchez-Ramirez would either participate in the march, or be

4  terminated.  On September 9, 2011, Sanchez-Ramirez presented a note from his doctor

5  saying that participating in the march would exacerbate his condition.  He evidently did not

6  participate in the march.

7  On December 9, 2011, Mendoza told Sanchez-Ramirez that Corona was not

8  pleased with Sanchez-Ramirez's work, even though, according to Sanchez-Ramirez,

9  Corona had no direct contact with him in the workplace and did not oversee his

10  performance.  Mendoza told Sanchez-Ramirez that he had intervened with Corona and

11  asked him not to fire Sanchez-Ramirez, because he was pleased with Sanchez-Ramirez's

12  work and needed his assistance to finish an end-of-year report.  On behalf of Corona,

13  Maldonado told Sanchez-Ramirez that he could continue working at the Consulate if

14  Sanchez-Ramirez made an extra effort in performing his duties and more effort to get along

15  with his co-workers.

16  On December 16, 2011, Sanchez-Ramirez complained to Maldonado that Corona's

17  effort to terminate him was in retaliation for his inability to participate in the march, and a

18  complaint he had made about the Consulate attempting to obtain his private medical

19  information.  On December 21, 2011, Maldonado terminated Sanchez-Ramirez, effective

20  immediately.  The Consulate deposited Sanchez-Ramirez's paycheck on December 23,

21  2011, but allegedly never paid Sanchez-Ramirez for the overtime he had worked or the

22  vacation he had accrued, and did not offer him COBRA benefits following his termination.

23  Sanchez-Ramirez alleges that the Consulate discriminated and retaliated against

24  him on the basis of his disability by refusing to provide him with a reasonable

25  accommodation, and by terminating him when he was unable to participate in the march.

26  He also claims that the Consulate violated the California Labor Code by failing to provide

27  meal and rest breaks, by failing to pay overtime, by filing to pay his earned wages when he

28  was terminated.

United States District Court

For the Northern District of California

1    Sanchez-Ramirez asserts further that Corona knew that he identified as

2  homosexual, and that as a result, Corona was "always hostile" toward him and other

3  employees who identified as homosexual, and made "insulting remarks" about him to other

4  employees.  Sanchez-Ramirez claims that his sexual orientation was a motivating factor in

5  the Consulate's decision to discharge him.

6    Sanchez-Ramirez filed the complaint in the present class action in the Superior

7  Court of California, County of San Francisco, on June 1, 2012, alleging both individual

8  claims and claims on behalf of a proposed class.  The Consulate filed a notice of removal

9  on July 3, 2012, which was followed by a motion to dismiss.  On August 14, 2012,

10  Sanchez-Ramirez, joined by German, filed a first amended complaint ("FAC").

11    The FAC asserts six causes of action.  Plaintiffs allege three causes of action on

12  behalf of themselves and the members of the proposed class – (1) meal and rest period

13  violations, under California Labor Code §§ 512, 226.7; (2) failure to pay overtime, under

14  California Labor Code §§ 510, 1194; and (3) unlawful and/or unfair business practices,

15  under California Business & Professions Code § 17200 (based on the asserted Labor Code

16  violations).

17    In addition, Sanchez-Ramirez alleges three individual claims on his own behalf –

18  (4) disability discrimination, under the Americans With Disabilities Act, 42 U.S.C. § 12101

19  ("ADA"), and under the California Fair Employment and Housing Act, California

20  Government Code § 12940, et seq. ("FEHA"); (5) sexual orientation discrimination under

21  FEHA; and (6) failure to pay earned wages upon discharge, under California Labor Code

22  §§ 201, 203.

23                                          **DISCUSSION**

24  A.    Defendants' Motion

25    The Consulate argues that the FAC must be dismissed under Federal Rule of Civil

26  Procedure 12(b)(1) for lack of subject matter jurisdiction, because the Consulate is immune

27  from suit by virtue of its foreign sovereign immunity.  The Consulate also asserts that the

28  state law claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim because plaintiffs have not alleged (and cannot allege) facts showing that the Consulate is a "covered entity" under these statutes.  Because the court lacks subject matter jurisdiction over this case, it does not address the Rule 12(b)(6) motion.

1.      Legal standard

Federal courts are courts of limited jurisdiction, possessing only that power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto.  See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).  Thus, federal courts have no power to consider claims for which they lack subject-matter jurisdiction.  See Chen-Cheng Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1415 (9th Cir. 1992).  The court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction.  Id.; see also Spencer Enters., Inc. v. United States, 345 F.3d 683, 687 (9th Cir. 2003); Attorneys Trust v. Videotape Computers Prods., Inc., 93 F.3d 593, 594-95 (9th Cir. 1996).

The burden of establishing that a cause lies within this limited jurisdiction rests upon the party asserting jurisdiction.  Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994).  Thus, in the present action, petitioners bear the burden of demonstrating that subject matter jurisdiction exists over this complaint.  See, e.g., Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001).

2.      Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330, et seq., provides "the exclusive source of subject matter jurisdiction over all suits involving foreign states or their instrumentalities."  Gupta v. Thai Airways Int'l, Ltd., 487 F.3d 759, 763 (9th Cir. 2007) (citation and quotation omitted); 28 U.S.C. § 1603(a).

Under the FSIA, foreign states are presumptively immune from suit in federal and state courts, subject to a number of exceptions.  Embassy of the Arab Republic of Egypt v. Lasheen, 603 F.3d 1166, 1169 (9th Cir. 2010); see also 28 U.S.C. § 1604.  These exceptions are found in 28 U.S.C. § 1605 and § 1607, Verlinden B.V. v. Central Bank of

5

1   Nigeria, 461 U.S. 480, 488 (1983), and "focus on actions taken by or against a foreign

2   sovereign." In re Republic of Philippines, 309 F.3d 1143, 1150 (9th Cir. 2002).

3          To trigger the presumption that a foreign state is immune from suit, "the defendant

4   must make a prima facie case that it is a foreign state" or an entity with a sufficient

5   relationship to a foreign state, or it must "be apparent from the pleadings." Peterson v.

6   Islamic Republic Of Iran, 627 F.3d 1117, 1124 (9th Cir. 2010) (citations and quotations

7   omitted); California Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087, 1097 (9th Cir.

8   2008).

9          "The plaintiff then has the burden of going forward with the evidence by offering

10  proof that one of the FSIA exemptions applies." Siderman de Blake v. Republic of

11  Argentina, 965 F.2d 699, 708 n.9 (9th Cir. 1992) (citation and quotation omitted); see also

12  Phaneuf v. Republic of Indonesia, 106 F.3d 302, 306-07 (9th Cir. 1997).  Once the plaintiff

13  has presented such evidence, the defendant bears the burden of proving by a

14  preponderance of the evidence that the exception to sovereign immunity does not apply.

15  Siderman, 965 F.2d at 708 n.9.

16         Even where the material facts are disputed, the trial court may still evaluate the

17  merits of the jurisdictional claims in cases arising under the FSIA. See Doe v. Holy See,

18  557 F.3d 1066, 1073 (9th Cir. 2009); see also Schwarzer, Tashima & Wagstaffe, Federal

19  Civil Procedure Before Trial ¶ 9:104 (2013 ed.).  In this case, the Consulate has made fact-

20  based challenges to plaintiffs' assertion of jurisdiction, and both parties have submitted

21  declarations and other evidence to the court.

22         The two most commonly invoked FSIA exceptions are those for commercial acts and

23  for tortious acts. See Sachs v. Republic of Austria, 695 F.3d 1021, 1023 (9th Cir. 2012); 28

24  U.S.C. § 1605(a)(2), (a)(5).  Plaintiffs allege that the Consulate's "employment of [p]laintiffs

25  and of [c]lass [m]embers who performed clerical duties" falls under the commercial activity

26  exception to the FSIA, FAC ¶ 8, and that the Consulate is therefore not immune from suit.

27         Under the commercial activity exception,

28

United States District Court
For the Northern District of California

6

United States District Court

For the Northern District of California

1

2

    (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –

. . .

3

4

5

6

    (2) in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).

7

8

    The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," and provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

9

10

11

12

13

    The Supreme Court has noted that this definition is not particularly helpful, as it "leaves the critical term 'commercial' largely undefined."  Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992).  The Court also explained, however, that a government's act is "commercial" if it is the type of transaction that private actors could complete; on the other hand, if it is one that requires sovereign power, such as a government's regulation of the market or use of its police power, it is public in nature and thus not within the "commercial activities" exception.  Id.; see also Saudi Arabia v. Nelson, 507 U.S. 349, 360 (1993) (foreign sovereign engages in commercial activity when it exercises "only those powers that can also be exercised by private citizens," versus those "powers peculiar to sovereigns").

14

15

16

17

18

19

20

21

22

23

24

25

26

    Thus, in Holden v. Canadian Consulate, 92 F.3d 918 (9th Cir. 1996), the Ninth Circuit distinguished the Canadian government's employment of diplomatic, civil service, or military personnel in the United States (a sovereign or governmental function) from the hiring or engagement of other personnel, such as laborers, clerical staff, or public relations or marketing agents (a commercial activity).  Id. at 921.

27

28

    In addition, however, for the "commercial activities" exception to apply, it is not

7

1   enough for the foreign state merely to have engaged in a commercial activity.  Rather the

2   statutory language requires that the plaintiff's cause of action be "based upon" the

3   commercial activity in question.  Id. at 920 (citing Gates v. Victor Fine Foods, 54 F.3d 1457,

4   1463 (9th Cir. 1995)).  A plaintiff's claim is "based upon" those activities that are elements

5   of the claim that would entitle the plaintiff to relief.  Id. (citing Nelson, 507 U.S. at 356-57).

6          3.      Defendant's motion

7          The Consulate argues that it is immune from suit by virtue of its foreign sovereign

8   immunity.  There is no dispute that the Consulate is part of the Republic of Mexico.[1]

9   However, plaintiffs allege in the FAC that the Consulate is subject to suit based on its

10  commercial activities carried on in the United States.

11         Under the "commercial activity" analysis, "the question is not whether the foreign

12  government is acting with a profit motive or instead with the aim of fulfilling uniquely

13  sovereign objectives," but rather whether the government's actions "are the type of actions

14  by which a private party engages in" commerce.  Weltover, 504 U.S. at 614.  For example,

15  in Joseph v. Office of Consulate General of Nigeria, 830 F.2d 1018 (9th Cir. 1987), the

16  Ninth Circuit held that a contract to purchase military supplies, although clearly taken for

17  public use, is commercial in nature and thus subject to the commercial activity exception.

18  See id. at 1023.

19         Similarly, in Weltover, the Supreme Court found that Argentina's issuance of, and

20  subsequent defaulting on, bonds constituted a commercial activity for the purposes of the

21  FSIA because "when a foreign government acts, not as regulator of a market, but in the

22  manner of a private player within it, the foreign sovereign's actions are 'commercial' within

23  the meaning of the FSIA."  Id., 504 U.S. at 614.  The Court emphasized that the FSIA's

24  analysis is focused on the "nature" of the activity, and Argentina creating debt instruments

25  was directly analogous to "a private commercial transaction."  Id. at 615-16.

26  _____

27         [1]  A foreign state includes a "political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  An "agency or instrumentality of a foreign state" includes "an organ or a foreign state or political subdivision thereof."  Id. §
28  1603(b).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    In Holden, in determining whether employment by a foreign government constitutes

2   "commercial activity" under § 1605(a)(2), the court first analyzed whether the nature of the

3   work the employee performed was that of a "civil servant" or a "diplomat," or other role

4   described in the FSIA's legislative history; and then considered whether, in any event, the

5   work was of the nature that private persons typically perform.  Id. 92 F.3d at 921-22.

6    Here, the Consulate notes, plaintiffs Sanchez-Ramirez and German are both

7   Mexican nationals, who worked in the United States (at the Consulate) after obtaining A-2

8   visas.[2]  The Consulate argues that both Sanchez-Ramirez and German were civil servants,

9   and that the nature of their work – assisting the Consulate in its capacity as notario publico

10   and in issuing passports to Mexican citizens – was fundamentally governmental in nature.

11    Sanchez-Ramirez' supervisor, Deputy Consul General Enrique Maldonado, explains

12   in his declaration in support of the Consulate's motion to dismiss that Sanchez-Ramirez

13   "was responsible for drafting the documents related to power of attorney and other notarial

14   acts for the signature of . . . the Consul General."  Maldonado Decl. ¶¶ 4, 8.  Maldonado

15   also states that Sanchez-Ramirez was also responsible for applying the laws and

16   regulations governing the notarial acts that he helped perform, and had discretion to deny a

17   request of an applicant who he determined did not meet the legal requirements for the

18   notarial act he/she sought the Consulate's assistance in performing."  Id. ¶ 8.  According to

19   Maldonado, the documents prepared by Sanchez-Ramirez provided legal documentation

20   necessary to complete such transactions as closing bank accounts or transferring title to

21   real property, and that documentation became part of a Mexican national archive, where

22

23    [2]  According to the U.S. Department of State, in order to obtain an A-1 or A-2 visa, an
individual "must be traveling to the United States on behalf of [his/her] national government to
24   engage solely in official activities for that government."  In addition, "the particular duties or
services that will be performed must be governmental in nature or character, as determined
25   by the United States Department of State, in accordance with U.S. immigration laws."  That
is, "[g]overnment officials traveling to the United States to perform non-governmental functions
26   of a commercial nature . . . require the appropriate visa, and do not qualify for A visas."  See
United States Department of State, "Visas for Diplomats and Foreign Government Officials,"
27   http://travel.state.gov/visa/temp/types/types_2637.html.   A-2 visas are granted to foreign
government employees who are not ambassadors, public ministers, career diplomatic or
28   consular officers, or members of their immediate families.  See Park v. Shin, 313 F.3d 1138,
1143 (9th Cir. 2002).

United States District Court

For the Northern District of California

1   notarial acts are collected as legal proof of the acts performed.  Id. ¶ 4 and Exh. 1.

2          Sanchez-Ramirez himself states in his declaration filed in opposition to the

3   Consulate's motion to dismiss that after he began working for the Consulate in San

4   Francisco, he first worked in the Legal Affairs Department, where he assisted the Director

5   of the Department and attended to customers who came to the Consulate seeking legal

6   services, such as contacting detained or incarcerated relatives, transporting the remains of

7   deceased relatives to Mexico, and recovering unpaid wages.  Sanchez-Ramirez Decl. ¶ 7.

8          Sanchez-Ramirez was then transferred to the Documentation Department, where he

9   worked in the visa section.  His duties there involved handing applications to the public,

10  assisting the public in filling out the applications, inputting information into the computer,

11  taking photographs and fingerprints, creating files, printing visas, and other duties relating

12  to the visa-issuance process.  While he did not have the authority to grant or deny any

13  application, he did have the responsibility of reviewing the applications and informing

14  applicants when they did not have the proper documentation.  Id. ¶ 6.

15         Sanchez-Ramirez was later transferred from the visa section of the Documentation

16  Department to the notary section.  Here, he states, he interacted with members of the

17  public who came to the Consulate seeking services such as powers of attorney, wills, or

18  certified copies of certain documents.  His duties included providing applications for notarial

19  services to the customers, receiving completed applications, and interviewing customers to

20  obtain information to be inserted into official forms.  He claims that he did not have the final

21  authority to determine whether the Consulate would exercise a notarial act, but he did have

22  the responsibility of reviewing the applications and determining whether the applicant had

23  submitted the proper documentation, and informing them of what additional documentation

24  was required.  Id. ¶ 9.

25          In addition to performing these duties at the Consulate, Sanchez-Ramirez from time

26  to time traveled throughout California (and sometimes other parts of the United States),

27  providing assistance to Mexican nationals who were unable to travel to a Mexican consular

28  post.  Maldonado Decl. ¶ 6.

United States District Court

For the Northern District of California

1    The Consulate asserts that in serving Mexican nationals who required notarial

2  services, Sanchez-Ramirez was performing several core functions of a consulate under

3  international law.  See Vienna Convention on Consular Relations ("Vienna Convention"),

4  Art. 5, Secs. (a), (e), (f), Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820.  The Consulate

5  also notes that due to his status at the Consulate, Sanchez-Ramirez was not required to

6  pay any federal or state income taxes, again due to the protections of the Vienna

7  Convention.  See id., Art. 49(2).

8    As for plaintiff German, Armida Tello Quinones ("Tello"), the Consul for

9  Administrative Affairs at the Consulate, states in her declaration that she was a Mexican

10  citizen and had earned a law degree in Mexico; and that she worked at the passport

11  screening desk; her duties involved making an initial determination of whether an applicant

12  had submitted the necessary materials, including proof of identification, in order to have a

13  passport issued or renewed.  Tello Decl. ¶¶ 2-3; Exhs. 1, 6.  According to Tello, German

14  was responsible for applying government rules regarding the issuance of Mexican

15  passports, and had the discretion to deny an applicant who lacked the required

16  documentation.  Id. ¶ 3.  German resigned from the Consulate in June 2009.  Id. ¶ 2.

17    As with Sanchez-Ramirez, the Consulate contends that the work performed by

18  German consists of core consular functions recognized by the Vienna Convention, which

19  provides that "consular functions consist in . . . issuing passports and travel documents to

20  nationals of the sending State, and visas or appropriate documents to persons wishing to

21  travel to the sending State."  See Vienna Convention, Art. 5, Sec. (d).

22    The Consulate argues, based on the above, that the work it hired Sanchez-Ramirez

23  and German to perform was in the nature of civil service, because it served to further the

24  Consulate's role as a notario publico and its role in the issuance of passports and visas on

25  behalf of the Mexican government; and that such actions cannot be characterized as

26  actions of the kind by which a private party engages in commerce.  See Lasheeen v.

27  Embassy of the Arab Republic of Egypt, 485 Fed. Appx. 203, 205, 2012 WL 2514204 at *1

28  (9th Cir. July 2, 2012) (citing Weltover, 504 U.S. at 614; Nelson, 507 U.S. at 360).

United States District Court

For the Northern District of California

1        The Consulate adds that nothing in the text or the legislative history of the FSIA

2   suggests that the Act was enacted to create jurisdiction for U.S. courts to hear claims

3   between a foreign sovereign and its citizens, and that indeed, the legislative history shows

4   that it was intended to confer jurisdiction to "American citizens" and business disputes

5   arising from their interactions with foreign sovereigns. See H.R. Rep. No. 94-1487 at 6-7

6   (1976).

7        In opposition, plaintiffs contend that the Consulate is subject to this court's

8   jurisdiction under the commercial activities exception, because their jobs at the Consulate

9   involved the performance of clerical work as support staff.  In addition, they assert in

10  assessing the nature of the defendant's conduct for purposes of the commercial activities

11  exception, the court must examine "those elements of a claim, that, if proven, would entitle

12  a plaintiff to relief under his theory of the case," as stated by the Supreme Court in Nelson,

13  507 U.S. at 357.

14       Plaintiffs argue that because the claims asserted in the FAC are based on the

15  Consulate's failure to comply with federal and state employment statutes, and because the

16  alleged violations do not implicate concerns "peculiar to sovereigns," they do not support

17  application of the commercial activities exception to the FSIA.  Plaintiffs contend that what

18  is relevant for purposes of the commercial activity analysis is the nature of the Consulate's

19  violations, which plaintiffs assert were undeniably "commercial."

20       Plaintiffs note that in Holden, the Ninth Circuit looked at the following factors to

21  determine whether the plaintiff, a "Commercial Officer" employed within the Trade and

22  Investment Section of the Canadian Consulate, was a civil servant – whether the

23  plaintiff/employee competed by examination for any position before being hired; whether

24  the plaintiff/employee was entitled to tenure; whether the plaintiff/employee was provided

25  the same benefits as the foreign service officers (such as an allowance for moving

26  expenses, a round-trip ticket home every two years, an official civil service passport, or a

27  sales tax exemption); and whether the plaintiff/employee received any civil service

28  protections from the Canadian government. Id., 92 F.3d at 921.  The court answered these

United States District Court

For the Northern District of California

1   questions in the negative, and concluded that the plaintiff was not a civil servant for

2   purposes of the commercial activities exception to the FSIA.

3         Here, plaintiffs assert, the Consulate's "local employees" (employees who are hired

4   through "temporary appointments" of a year's duration, and whose appointments are

5   renewable) are not civil servants.  Plaintiffs contend that because they are not Mexican

6   Foreign Service employees, and do not receive all of the same benefits as the Foreign

7   Service employees, and because they play no role in governmental policymaking, lobbying

8   activities, or legislative work, they necessarily cannot be considered civil servants.

9         With regard to Sanchez-Ramirez, plaintiffs contend that the mere fact that he

10  worked in the notario section of the Consulate does not mean that his duties were uniquely

11  governmental.  Indeed, plaintiffs assert, Sanchez-Ramirez himself never acted in the

12  capacity of a notario publico and never even took the exam in Mexico to become a notario.

13  Plaintiffs also take issue with the Consulate's claim that Sanchez-Ramirez was hired as "an

14  attorney," arguing that he was actually hired as "a clerk" to provide "support services."

15  They concede that he has a law degree from Mexico, but argue that he never actually

16  practiced law anywhere, and a law degree was not a requirement for his employment at the

17  Consulate.

18        In addition, plaintiffs assert that Sanchez-Ramirez did not exercise discretion or

19  engage in any specialized legal work, and that his duties were limited to reviewing

20  documents and asking for additional information where necessary – duties that they claim

21  were essentially clerical or administrative.  For example, plaintiffs argue, Sanchez-Ramirez

22  had no authority to issue final documents.  They contend while the Consulate may have

23  employed Sanchez-Ramirez for a governmental purpose, the nature of Sanchez-Ramirez's

24  work here was contracted for in the same way as any private employment would be.

25        Similarly, with regard to the Consulate's claim that Sanchez-Ramirez traveled

26  around California (and even to other states) to assist Mexican citizens who could not come

27  to a consular office, plaintiffs respond that this did not constitute "behavior peculiar to

28  sovereigns," as representatives of non-governmental organizations and others visit

13

United States District Court

For the Northern District of California

1  detainees every day.  They argue that while the Consulate may have had a governmental

2  purpose in sending Sanchez-Ramirez on these trips does not mean that the nature of the

3  work he performed was anything other than administrative or clerical.

4       Plaintiffs also assert that the Consulate's employment of German did not constitute a

5  uniquely governmental act.  They contend that German did not have the authority to grant

6  or deny any application for a visa or passport, or to exercise any discretion as to what was

7  required.  They assert that her role was limited to clerical duties – handing out applications,

8  assisting the public in filling out the applications, inputting information into the computer

9  system, taking fingerprints and photographs, and copying and filing documents.

10 The court finds that the motion must be GRANTED, for the reasons argued by the

11 Consulate.  The "commercial activity" exception to the FSIA imposes two requirements –

12 the foreign state must have engaged in a commercial activity, and the plaintiff's cause of

13 action must be "based on" that commercial activity.  Holden, 92 F.3d at 920; see 28 U.S.C.

14 § 1605(a)(2).  In an employment-related case, the court does not look at the mere act of

15 the foreign sovereign's hiring or employment of the plaintiff; rather, the court must examine

16 the nature of the plaintiff's activities as an employee of the foreign sovereign to determine

17 whether the employee was a civil servant or diplomatic officer.  Id. at 921.

18      Here, the Consulate employed Sanchez-Ramirez and German to assist it in official

19 governmental functions such as the provision of notarial services and the issuance of

20 passports and visas.  Such actions are not "the type of actions by which a private party

21 engages in" commerce.  See Welltover, 504 U.S. at 614.  Thus, because their employment

22 was governmental, Sanchez-Ramirez and German were employed as civil servants,

23 regardless of whether they may also have engaged in "clerical" or "administrative" activities

24 as part of their employment.  Indeed, almost any job involving documentation will have

25 "clerical" or "administrative" aspects.  What distinguishes the plaintiffs' positions at the

26 Consulate from positions in the private sector is that private parties are not capable of

27 issuing, processing, or reviewing official foreign government documents such as those at

28 issue here.

United States District Court

For the Northern District of California

1    Thus, while Sanchez-Ramirez may not have had final approval in any given case, he

2  had primary drafting responsibility, as well as the discretion to determine when

3  documentary standards for notarial acts were met.  In addition, while Sanchez-Ramirez

4  may not have been actually practicing law while he worked at the Consulate, he was

5  responsible for selecting the correct forms that corresponded to particular legal actions

6  Mexican nationals wanted the Mexican government to accomplish, and was also

7  responsible for filling out the forms with information provided by Mexican nationals, as well

8  as adhering to strict documentation requirements and submitting the forms to his

9  supervisors for ultimate approval.

10    Similarly, German's work was governmental.  For example, the task of verifying the

11  identity of persons seeking government-issued identification is not work that can be

12  performed by private persons in commerce.  German herself has described her duties as

13  involving "attending to members of the public who sought government issued identification

14  cards, visas, and passports."  In that capacity, she provided applications to members of the

15  public, assisted them in filling out their applications, and took fingerprints and photographs.

16  In addition, she "informed applicants when they did not have the proper documentation . . .

17  so that they could return later with that documentation."  German Decl. ¶¶ 5-6.

18    At a minimum, plaintiffs' employment was "intertwined" with government activity.

19  Because the unquestionably governmental acts that plaintiffs performed are so integral to

20  the role of the Foreign Ministry, which could not provide these services to Mexican

21  nationals without "local employees" such as plaintiffs, plaintiffs' job duties and the

22  Consulate's hiring of plaintiffs to perform those duties must be viewed as governmental

23  rather than commercial.

24    Finally, while plaintiffs' employment status may not have entitled them to the

25  identical benefits that members of the Foreign Service received, plaintiffs did receive many

26  of the same type of benefits, such as health benefits and relief from the obligation to pay

27  taxes.  Moreover as bearers of A-2 visas, they were able to travel freely in the U.S., and

28  live in country without fear that their immigration status would be challenged.  Finally, they

received life insurance, an annual bonus (required under Mexican law, but not U.S. law),

thirty days' vacation, and (for German) maternity leave.

### CONCLUSION

In accordance with the forgoing, the court finds that the Consulate's motion to

dismiss for lack of subject matter jurisdiction must be GRANTED.  Because the court has

no jurisdiction over the case, it cannot consider any other motions, including defendants'

12(b)(6) motion and plaintiffs' motion to amend the complaint.

**IT IS SO ORDERED.**

Dated:  August 5, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge

**United States District Court**
For the Northern District of California